Honorable Thomas S. Zilly

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

JONATHAN WENDER,

          Plaintiff,

    v.

SNOHOMISH COUNTY, et al.,

          Defendants.

No. CV07-0197Z

PLAINTIFF'S RESPONSE TO
DEFENDANT CITY OF LYNNWOOD
AND STEVE RIDER'S MOTION FOR
SUMMARY JUDGMENT

NOTED ON MOTION CALENDAR:
FRIDAY, JULY 18, 2008

**ORAL ARGUMENT REQUESTED**

MACDONALD HOAGUE & BAYLESS
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

1    Without setting forth the elements, Defendant Rider[1] moves for summary judgment on

2    Plaintiff's First Amendment claim under 42 U.S.C. § 1983 that he was retaliated against for

3    engaging in free speech activities critical of drug policy. Cmdr. Rider's primary argument is that

4    he cannot be held liable for the damages caused by his retaliatory acts simply because he has no

5    employment relationship with Sgt. Wender. *See* Lynnwood SJ Motion ("Motion), at pg. 12. Not

6    only is this argument unsupported by any citation to legal authority, *id.*, it is incorrect as a matter

7    of law. He further moves for dismissal on the grounds that there is no basis in fact to allege

8    Cmdr. Rider's actions in initiating a criminal investigation were to retaliate against Sgt. Wender.

9    *Id.* at 14. There is substantial evidence of retaliation by Cmdr. Rider against Sgt. Wender,

10    including his own writings; in addition, that question is intensely factual and requires an

11    assessment of the credibility of witnesses, including Cmdr. Rider. Facts are disputed and

12    summary judgment should be denied.

13    At the center of this dispute is whether it was within Sgt. Wender's discretion to

14    enforce the law in a low-key manner by calling a 9-1-1 complainant's estranged husband and

15    effectively telling him to comply with the law by destroying a single marijuana plant. The

16    material facts surrounding this question are hotly disputed. For purposes of this motion, the

17    Court must accepted as true Plaintiff's contention, supported by substantial evidence in the

18    record, that this was a routine exercise of police discretion. At issue then, is Cmdr. Rider's

19    motivation for initiating a criminal investigation against Sgt. Wender for this routine exercise

20    of police discretion, against a fellow officer who he admittedly thinks is a "fine officer,"

21    Ex. L[2] Rider Dep. 32:8-10, and who never before had been accused of failing to enforce the

22    drug laws. The very fact that Cmdr. Rider characterized Sgt. Wender's actions as *criminal*

23    misconduct and initiated a criminal investigation of him suggests Cmdr. Rider was motivated

24

25    [1] In his complaint, Plaintiff did not make First Amendment claims against the City of Lynnwood.
      See Dkt. 52. ¶ 4.1.

26    [2] All exhibits are attached to the Declaration of Joseph R. Shaeffer. The alphabetic exhibits are
      declarations, deposition excerpts, and other documents not previously marked as deposition
      exhibits. Numerical exhibits are deposition exhibits marked consistently with their original
      numbering.

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

1    by something other than his own claimed duty to comply with Lynnwood policy to report

2    misconduct - - namely, retaliation for Sgt. Wender's political views on drug policy.

I.    FACTUAL BACKGROUND

4    Contrary to the Defendant's assertion, material facts are in dispute.  On summary

5    judgment, not only must all of *Plaintiff's* factual allegations be accepted as true, all reasonable

6    inferences from those facts must be drawn in Plaintiff's favor.  *See, e.g., Ostad v. Oregon*

7    *Health Sciences University*, 327 F.3d 876, 881 (9th Cir. 2003).  Under that analysis, entry of

8    judgment as a matter of law here is impossible.  Context and credibility are everything.  A

9    jury must be allowed to decide whether they believe Cmdr. Rider's explanations and his

10   claimed motives in light of conflicting facts, evidence, and inferences.

11   A.    The South Snohomish County Narcotics Task Force

12   The South Snohomish County Narcotics Task Force ("Task Force") primarily serves

13   the constituent members of the cities of Edmonds, Mountlake Terrace, and Lynnwood; it

14   operates outside the offices of the three police departments under the administrative

15   supervision of Lynnwood.  Ex. O Mitchell Dep. 41:24-43:14.  In June of 2005, Cmdr. Rider

16   was the Cmdr. of the Task Force.  Ex, L Rider Dep. 16:19-17:12.  The sole purpose of the

17   Task Force is to investigate drug crimes, primarily targeting mid-level to higher-level

18   narcotics dealers.  *Id.* at 30:1-3; Ex. M Williams Dep. 18:8-11.  According to Task Force

19   member Det. Corey Williams, Task Force members are all "extremely aggressive and go-

20   getters."  Ex. M Williams Dep. 23:15-24:16.  The Task Force limits each detective's caseload

21   to two investigations at a time so each detective gets a fair chance to run cases.  *Id.*

22   Individual officers are assigned from the constituent agencies to a term of duty on the

23   Task Force.  There are benefits to those who participate.  For example, the prosecutor for the

24   Task Force gets a "free car" with a "nice stereo."  Ex. N Roe Dep. 76:13-25.

25   B.    Task Force Members Upset When Others Question Its Purpose

26   Drug task force members are institutionally committed to the "war on drugs," and tend

27   to be resistant to criticism or suggestion for public policy change that has the potential to

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

decrease or eliminate their purpose.  Members of drug task forces close ranks and enforce the code of silence when individuals in law enforcement publicly call into question the effectiveness of the drug policy they are committed to enforce.  For example, Defendant Mark Roe was originally chosen to be the first deputy prosecutor assigned to the Snohomish Regional Narcotics Drug Task Force (a neighboring Task Force).  He declined, claiming he told them, "if I had to do nothing but drug cases, I'd rather quit.  I don't want to do that."  Ex. N Roe Dep. 73:2-11.  Like Sgt. Wender, Mark Roe doesn't believe our laws on marijuana are not working very well.  *Id.* at 76:11-20.  He prefers to prosecute crimes of "moral and immoral" rather than drug crimes, which he considers to be crimes of "legal and illegal."  *Id.* at 77:25-78:5.  On more than one occasion since then, Regional Task Force members have chastised Mr. Roe for speaking his mind on drug policy:

> that statement by me has come back to haunt me on occasion because I've had people, for instance, you know, Pat Slack, who is the head of the task force now, want to talk to me about that, and want me not to be quite as open about that.
> * * * *
> when Jim Townsend, the chief criminal deputy, offered me that position, I made some typically profane and probably not well thought out comments about doing nothing but drug cases, which then, much to my chagrin, I found out later Townsend repeated to the people at the Drug Task Force who had asked for me to be the prosecutor, and I had some uncomfortable moments with Ron Perniciaro and some others, phone calls like, "Hey, we hear you think we're all wasting our time."  Thanks, Jim.

*Id.* at 73:2-11; 77:2-11.

Similarly, the Task Force members were very unhappy with Sgt. Wender when he was quoted in a *Seattle Weekly* article that was critical of current drug policy and the inefficiencies of law enforcement related to it.  That article discussed an organization called "Law Enforcement Against Prohibition," otherwise known as "LEAP."[3]  The article quoted Sgt. Wender out of context as saying "I'm tired of putting myself in harm's way for a losing cause."  Ex. 18 (Weekly Article).  Members of the Task Force were angry.  Det. Corey

---

[3] Sgt. Wender was an open member of LEAP.  He also participated in the bi-partisan King County Bar Association's Drug Policy Task Force, and was a co-author of a report on drug policy reform.  Ex. 82(KCBA Task Force Report).

PLAINTIFF'S RESPONSE TO DEFENDANT CITY OF
LYNNWOOD AND STEVE RIDER'S MOTION FOR SUMMARY
JUDGMENT - 3
No. CV07-0197Z
8761.01 be22090l.v2

MACDONALD HOAGUE & BAYLESS
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

1   Williams testified that what Sgt. Wender had said made him very angry because it "made it

2   seem like what we did didn't matter and that it was a -- a useless endeavor, and none of us in

3   the task force believe that." Ex. M Williams Dep. 16:15-18:11.

4       After this article, and leading up to and continuing around the time of the initiation of

5   the criminal investigation of Sgt. Wender, someone in Lynnwood highlighted Sgt. Wender's

6   free speech activities by posting Sgt. Wender's speaker's profile from the LEAP website on

7   the bulletin board in the Lynnwood Police Department offices. Ex. V Rider responses to

8   ROGs; Ex. L Rider Dep. 17:18-18-13.

9       C.    Rider's Criminal Investigation Memo Demonstrates First Amendment Animus

10      Cmdr. Rider heard third hand from someone at the Task Force that Sgt. Wender had

11  taken a call regarding a single marijuana plant, then had called the resident and told him "he

12  should rethink his outdoor landscaping." Ex. 75 (Rider memo). Rather than call up

13  Sgt. Wender to see if there was some kind of misunderstanding, or to tell him that he

14  disagreed with the way he handled the call, Cmdr. Rider called DPA John Adcock at the

15  Snohomish County Prosecutor's Office -- even before reporting any concerns up his own chain

16  of command. Ex. 75 (Rider memo) This is highly unusual in policy practice. Ex. U Van

17  Blaricom Dep 61:2-62:10. He then initiated a criminal investigation.[4] He researched various

18  criminal statutes and made the case that Sgt. Wender had violated them; he collected various

19  Computer Assisted Dispatch ("CAD") and unit activity logs; he did internet research on Sgt.

20  Wender's free speech activities; and he drafted a memorandum recommending criminal

21  investigation. Ex. 75 Rider Memo; Ex. 80 LYNN 822.

22      In that June 14, 2005 memo, Cmdr. Rider declares:

23      Sgt. Wender is very outspoken about his disagreement with drug prohibition
        and specifically his belief that marijuana should be legalized, however,

24

25  ────────────────────

26  [4] Cmdr. Rider contends that he was not doing a criminal investigation, he merely recommended
    one. But according to Co-Defendant Mike Mitchell, "Anytime you start an investigation and
    then you talk to the prosecutor and you're putting together paperwork, I draw the assumption that
27  you're working towards a criminal investigation." Ex. O Mitchell Dep. 129:16-19.

PLAINTIFF'S RESPONSE TO DEFENDANT CITY OF
LYNNWOOD AND STEVE RIDER'S MOTION FOR SUMMARY
JUDGMENT - 4

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

No. CV07-0197Z
8767.01 bc229901v2

manufacturing marijuana is a Class C felony whether one agrees with the law or not.

Ex. 75 (Rider memo).   Although he includes commentary on what he erroneously believes are Sgt. Wender's drug policy views[5] in the memo, Cmdr. Rider declares in discovery that "plaintiff's views on drug policy are immaterial to Cmdr. Rider's review of his conduct during the Jasper marijuana grow investigation." Ex. L Rider Dep. 10:14-21.  When asked to explain why he included a so-called "immaterial" political comment in his criminal investigation recommendation, Cmdr. Rider *four times* stated he did this just because it is "true" that Sgt. Wender is "outspoken." Ex. L Rider Dep. 11:6-13; 12:9-15; 12:21-13:9. His only other explanation for inclusion of Sgt. Wender's  political viewpoint in a memo recommending criminal investigation is that it "may give reason" why Sgt. Wender handled the call the way he did.  Ex. L Rider Dep. 12:21-13:3.

At the same time that Cmdr. Rider was investigating Sgt. Wender and leveling criminal accusations against him, he wrote to Cmdr. Stanifer at Lynnwood and mocked Sgt. Wender for his protected views on criminal justice.  On June 13, 2005, he wrote:

> This is part of his Humanities 101 class in Vancouver.  Found it on the net.  It's a quote from the Readers Digest:
>
> "Locking people up doesn't change them.  Nor does giving them a vocational skill," says Wender . "But if you show them their own dignity-the mystery of their own existence-then you can change them."
>
> Nice huh?

---

[5] Cmdr. Rider's knowledge of Sgt. Wender's political views on drug policy is based entirely on third hand rumor information and is factually incorrect.  He testified that he has "heard" from "chatter around the department" that Sgt. Wender is very outspoken about "legalization" of marijuana. Ex. L Rider Dep. 13:18-14:8.  He claims he also "read it for myself at some point on a LEAP website. . . . he [Wender] believes it [marijuana] should be legalized, was my understanding, from what I read at the time." Ex. L Rider Dep. 13:25-14:15.  In fact, Sgt. Wender's speaker's profile that was posted on the LEAP website says *nothing* about legalization of marijuana. Ex. 16.  Cmdr. Rider grossly oversimplifies and misstates what Sgt. Wender is "outspoken" about.  Indeed, Sgt. Wender's on drug policy are complicated and evolving; he does not "disagree" with "prohibition" of most drugs, and does not advocate for complete "legalization" of marijuana, but rather thinks that possession of small amounts of marijuana should be decriminalized and made a civil infraction rather than a crime.  Ex. P Wender Dep. pp. 25-36.

PLAINTIFF'S RESPONSE TO DEFENDANT CITY OF
LYNNWOOD AND STEVE RIDER'S MOTION FOR SUMMARY
JUDGMENT - 5

No. CV07-0197Z

8701.01 be220901.v2

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

Ex. 80 LYNN 822. Cmdr. Rider admitted in his deposition that his remark "Nice, huh?" was intended to be sarcastic because he thought Sgt. Wender's quote was "funny." Ex. L Rider Dep. 53:22-55:1. Cmdr. Rider explained his disagreement with his viewpoint:

> I'm a police officer, and I have been for 18 years. I believe in what we do. I believe we lock people up who commit criminal offenses. *I don't believe that we ignore that* and instead show them their own dignity and the mystery of their own existence.

Ex. L Rider Dep. 55:20-25 (emphasis added). Although the quote from Sgt. Wender says nothing about "ignoring" criminal offenses, Cmdr. Rider assumed that is what Sgt. Wender meant, and that Sgt. Wender had similarly "ignored" crimes in handling the June 9, 2005 call.

### D. Sgt. Wender Exercised Routine Discretion in Handling the June 9, 2005 Call

According to Defendant Mike Mitchell's summary report, the evening of June 9, 2005 was a "busy" shift, and Sgt. Wender had "people missing from the schedule." Ex. 33. Under these circumstances, Sgt. Wender saw a call on his Mobile Data Terminal ("MDT") that read:

> RP [Reporting Party] WAS JUST AT HER EX HUSBAND'S RES [residence] AT 2320263 AV W PICKING UP HER DAUGH TER [sic] – HAS A PARENTING PLAN THAT SAYS NEITHER PARENT CAN POSSESS CONTROLLED SUB STANCE [sic], RP FOUND MARIJUANA PLANT GROWING IN BACK YARD OF RES
>
> RP REQUESTING CONTACT AT HER RES OR BY 10-21 [telephone]

Ex. 34A Sgt. Wender took the call. Ex. 34F (WENDER 107).

Sgt. Wender called the complainant and asked how he could help. Ex. 34F WENDER 107. She told Sgt. Wender that she had just seen a single marijuana plant growing outside her estranged husband's house when she picked up her daughter from a visit. Ex. 34F WENDER 107. He asked the reporting party to clarify that what she was reporting was a single marijuana plant growing outside the house. Ex. 34F WENDER 107. She confirmed this, and that she did not believe that her ex-husband was presently growing other plants or selling marijuana. Ex. 34F WENDER 107-08; *see also* Ex. 34C WENDER 098. Sgt. Wender then asked a series of questions to rule out other issues. Ex. 34F WENDER 107-08. On the basis of all of this, especially in the context of her references to her "ex husband" and the

MACDONALD HOAGUE & BAYLESS
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604 Fax 206.343.3961

1    "parenting plan," Sgt. Wender began to view this call as one of the complainant trying to get

2    her former spouse in trouble to gain leverage in their contested custody proceedings, rather

3    than a true narcotics complaint.  Ex. 34F WENDER 109; Ex. P, Wender Dep. 433:4-20.

4    This was consistent with her stated intention:  to have something in writing "so that in my

5    family law case I could use this information."  Ex. 34G WENDER 100.

6         Sgt. Wender asked the complainant what she wanted to see happen.  Ex. 34G

7    WENDER 109.  Sgt. Wender recounts that she said she wanted there to be a record of her

8    having called, but she did not want to see her ex-husband go to jail or otherwise get in trouble.

9    Ex. 34F *Id.*  The caller admits that it is "very possible" she said this.  Ex. 34G WENDER 101

10   (complainant statement).  Sgt. Wender asked if she had any concerns for the safety and

11   welfare of her daughter, and she said that she did not.  Ex. 34F WENDER 108.  Sgt. Wender

12   suggested that he call up the ex-husband and tell him to dispose of the plant and comply with

13   the law.  Ex. 34F.  The complainant said she would appreciate that.  Ex. 34F WENDER 109.

14   She later admitted to agreeing with that course of action, and that she would "greatly

15   appreciate" that, though she wanted him to do more.  Ex. 34G WENDER 097.

16        Following his conversation with the complainant, Sgt. Wender called up the estranged

17   husband and told him to comply with the law, something like he should rethink his "choice of

18   plants for his spring garden."  Ex. 34F WENDER 110.  At the time, Sgt. Wender believed he

19   had handled the situation in a low-key manner consistent with the complainant's wishes, and in

20   a way that did not inject criminal legal concerns into a family already in crisis.  Ex. P Wender

21   Dep. 234:15-235:2.

22        E.    Cmdr. Rider's Extreme Overreaction To Routine Officer Discretion Shows Bias

23        Cmdr. Rider's reaction to Sgt. Wender's routine exercise of police discretion is

24   evidence of animus toward Sgt. Wender arising from his outspokenness on the drug war.  The

25   extraordinariness of initiating a criminal investigation is evidenced by others' reactions to

26   Sgt. Wender's actions as well as Cmdr. Rider's actions themselves.  Many witnesses have

27   stated that they believe Sgt. Wender's handling of the call was within his discretion.  And *no*

PLAINTIFF'S RESPONSE TO DEFENDANT CITY OF
LYNNWOOD AND STEVE RIDER'S MOTION FOR SUMMARY
JUDGMENT - 7

No. CV07-0197Z
8761.01 bc220901v2

1    *one other than Cmdr. Rider* (and half-heartedly Lynnwood Deputy Chief Ivers) thought

2    Sgt. Wender's actions were criminal.

3           Within the Mountlake Terrace Police Department, there was no concern about Sgt.

4    Wender's handling of the call at the time.  This was a routine exercise of police discretion,

5    both within the policies and practices of Mountlake Terrace, and more generally.  *See, e.g.,*

6    Ex. U Van Blaricom Dep. 11:6-12:5; 78:11-24.  When Sgt. Wender returned to the station

7    later that evening, he recounted the call to Officer Lora Tollefson, who commented that this is

8    what she would have done; she felt that it sounded as if Sgt. Wender had "effectively resolved

9    the problem."  Ex. 34F WENDER 111; Ex. 34C WENDER 091 (Tollefson statement).

10          The next day, however, the entire factual scenario known to the police changed.  The

11   complainant unlawfully entered her estranged husband's home, discovered and took pictures of

12   a small grow operation in the crawl space beneath his house, she brought them to Officer

13   Poteet at the Mountlake Terrace Police Department.  Ex. 34E (Poteet memo).  Based on this

14   new information, Officer Poteet referred the matter to the Task Force.  Ex. 43.  Ofc. Poteet

15   communicated this series of events to A/C Caw, including the fact that the complaining party

16   had dealt with Sgt. Wender the night before; at that time, no investigation was started and no

17   red flags were raised regarding Sgt. Wender's handling of the call.  Ex. C Poteet Dec. ¶ 6.

18   At no time did Ofc. Poteet consider Sgt. Wender's actions inappropriate or criminal.  Ex. C

19   Poteet Dec. ¶ 7.

20          Several other officers and a Sergeant from Mountlake Terrace have testified that how

21   Sgt. Wender handled the call was within his discretion and consistent with the policies and

22   practices of the Mountlake Terrace Police Department.  Ex. F Berg Dec. ¶ 7; Ex. G,

23   Esmeralda Dec. ¶ 8; Ex. J Guthrie Dec. ¶¶ 20-23; Ex. A Sgt. Hansen Dec.¶¶ 11-13; Ex. K

24   Hoeth Dec. ¶ 10.  Similar assessments were made by a former officer and acting sergeant of

25   Mountlake Terrace, Ex. I Jamison Dec. ¶¶ 9-10, a 26-year veteran drug enforcement agent,

26   Ex. H Harding Dec. ¶¶ 8, 10, a Seattle Police Officer formerly of Mountlake Terrace, Ex. E

27   Clay Dec. ¶¶ 7-8, and a Senior Special Agent for the Department of Homeland Security,

PLAINTIFF'S RESPONSE TO DEFENDANT CITY OF
LYNNWOOD AND STEVE RIDER'S MOTION FOR SUMMARY
JUDGMENT - 8

No. CV07-0197Z
8761.01/e220901v2

1  Ex. BCarnevale Dec. ¶ 8.  Plaintiff's police practices expert, former Bellevue Police Chief

2  D.P Van Blaricom, considers this to be routine police discretion.  *See, e.g.,* Ex. U Van

3  Blaricom Dep. 11:6-12:5; 78:11-24.

4  Det. Josh McClure of the Task Force took the referral from Officer Poteet and

5  investigated the grow operation based on the new photographic evidence brought in by the

6  complainant.  While he did not agree with how Sgt. Wender had handled the call the day

7  before, at no time did he think that Sgt. Wender's actions were criminal.   Ex. D McClure

8  Dec. ¶ 6.  Indeed, he didn't think twice about Sgt. Wender's handling of the call.  Ex. D

9  McClure Dec. ¶ 6. When Cmdr. Rider later approached Det. McClure with a packet of

10  information he had compiled to pursue Sgt. Wender on criminal charges, Det. McClure was

11  shocked. Ex. D McClure Dec. ¶ 10.

12  Similarly, even though he also disagreed with Sgt. Wender's handling of the call,

13  Det. Corey Williams of the Task Force stated that Sgt. Wender has the discretion to handle the

14  call the way he considers appropriate, including making the call to the complainant's husband.

15  Ex. M Williams Dep. 87:20-88:22.  He was surprised by Cmdr. Rider's decision to initiate a

16  criminal investigation into Sgt. Wender's actions, and did not consider anything Sgt. Wender

17  had done to have been criminal.  Ex. M Williams Dep. 88:23-89:16.

18  Det. William "O.J." Johnson of the Task Force then tipped off Defendant Mike

19  Mitchell that Cmdr. Rider had been in touch with a prosecutor and was launching a criminal

20  investigation into Sgt. Wender's conduct; Asst. Chief Mitchell was angry that Cmdr. Rider

21  had not contacted him directly.  Ex. Q Caw Dep. 84:2-18.  Defendant Mitchell then asked

22  Cmdr. Rider not to proceed any further with his criminal investigation so that Mountlake

23  Terrace could determine how to proceed and so that Sgt. Wender could get a "fair shake"

24  from an organization independent from the Task Force.  Ex. O Mitchell Dep. 130:5-11;

25  130:24-131:9.  The implication is that he thought Sgt. Wender might not get a "fair shake" if

26  investigated by the Task Force because of its, and Cmdr. Rider's, animus toward him.

27

MACDONALD HOAGUE & BAYLESS
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

1      Defendant Rider labels Sgt. Wender's advice to destroy an alleged single marijuana

2   plant to constitute destruction of "evidence" of a "felony crime."[6]  Yet, a single plant, or even

3   a grow of a few plants, would not have been charged as a felony in practice at the time

4   Sgt. Wender handled the call, and then, at most, as a misdemeanor.  Senior DPA John Adcock

5   considers the only time he ever charged a person with a felony for a single plant, early in his

6   career, a mistake, indeed, "ridiculous":

7         I now regard that as a mistake.  I thought it was excessive.  It was kind of
          stupid, actually, and I would never do that again.  But at the time, being, you
8         know, full of vim and vigor, I did it, but I regard that as a mistake.  It was
          excessive.  It was ridiculous, and I wouldn't do it again, which is why later on,
9         when I was confronted with a four or five plant grow, I would charge a gross
          misdemeanor.
10
    Ex. R Adcock Dep. 19:16-22:21.  As another indication of contemporary practice, in at least
11
    one instance, DPA Adcock directed the Task Force simply to issue a citation to a person found
12
    with a two-plant grow.  Ex. M Williams Dep. 65:18-66:8.
13
        F.      Snohomish County's Investigating Detective Sergeant and Prosecutor's Office
14              Concluded The Criminal Charges Were "BS"

15      Based on Cmdr. Rider's memo and actions initiating a criminal investigation,

16  Defendant Smith asked the Snohomish County Sheriff's Office to conduct the investigation into

17  Sgt. Wender's conduct.  Ex. S Smith Dep. 107:3-21.  Det. Sgt. Gregg Rinta was assigned to

18  the investigation; he recognized that Cmdr. Rider had initiated the criminal investigation, and

19  even listed him as the "complaining party" "[b]ecause he was the complainant -- he was

20  basically the one that started this from Lynnwood, I viewed it.  He's the one that wrote the

21  memo that started this, that got to Terrace, that eventually got to me."  Ex. T Rinta Dep.

22  47:17-48:6; Ex. 34H WENDER 000028.

23      Sgt. Rinta investigated Cmdr. Rider's alleged charges, and quickly concluded that the

24  charges were without merit--indeed, "BS."  Ex. T Rinta Dep. 117:10-24; Ex. N Roe Dep.

25  49:18-50:4.  Sgt. Rinta did not even investigate one of Defendant Rider's proposed charges,

26

27  [6] As a technical matter, it was not "evidence" but contraband.  Ex. U Van Blaricom Dep. at
    48:22-49:14.

MACDONALD HOAGUE & BAYLESS
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

complicity.  Compare Ex. 75 Rider memo with Ex. 34H Rinta narrative.  He communicated this sentiment to DPA John Adcock and Defendant Mark Roe, who also thought the criminal charges lacked merit and were "BS".  Ex. N Roe Dep. 39:13-40:13.  He told Defendant Roe "the criminal investigation was a waste of his time."  Ex. N Roe Dep. 47:7-19.

Both DPA Adcock and Defendant Roe then signed a Decline Notice, declining to file criminal charges against Sgt. Wender as alleged by Defendant Rider.  Ex. 34D.

G.    Defendant's Rider and Roe Communicate About Sgt. Wender During the so-called "Brady" Investigation

Once charges were declined, Mountlake Terrace instigated an internal investigation into Sgt. Wender's conduct surrounding the same incident. Ex. 34I WENDER 001.  Prior to rendering discipline or coming to a final conclusion about potential policy violations, Defendants Smith, Caw and Mitchell, in violation of department policies regarding confidentiality of internal investigations and personnel records, handed their investigation file to Defendant Roe to conduct a so-called "Brady" investigation and determination regarding an as-yet unsustained finding of untruthfulness.[7]  The "untruthfulness" issue was driven by the Snohomish County Prosecutor's office following the criminal investigation that had been set in motion by Defendant Rider.  *See, e.g.* Ex. 34E WENDER 125.  In the end, Sgt. Wender was issued a so-called "Brady" letter and was terminated.  Ex. 7 (Termination letter).

Despite Snohomish County's professed concern with the confidentiality of the "Brady" process (for example, Snohomish County was reluctant to provide names of officers subjected to the "Brady" process who had not been "Bradied"), Defendant Roe wrote an email to Defendant Rider *the day after he received the investigation file from Mountlake Terrace but prior conducting his "Brady" investigation*:

> I mEet [sic] with wender soon to talk about brady. I think he's finished, but that aint my call of course. It looks like he lied to rinta.

---

[7] Although the Snohomish County Defendants called their process a "Brady" process, their process was detached from the actual requirements of *Brady v. Maryland* and its progeny.

PLAINTIFF'S RESPONSE TO DEFENDANT CITY OF
LYNNWOOD AND STEVE RIDER'S MOTION FOR SUMMARY
JUDGMENT - 11

No. CV07-0197Z

MACDONALD HOAGUE & BAYLESS
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

1    Ex. 83 LYNN 834. Defendant Rider responded: "He shouldn't oughta lied. I think Rinta

2    would pick up on that. *Id.* Then Defendant Roe wrote back: "GET MY VM [voicemail]?"

3    *Id.* Defendant Rider responded "Got it this morning. Interesting. I'll talk to you about it

4    when you get back." *Id.* LYNN 833.

5        This email string "may have been preceded by one or more phone conversations."

6    Ex. W Rider Supp. Resp. to ROG 5. Yet Cmdr. Rider cannot recall anything about any

7    discussions with Defendant Roe that preceded this email string or the voice mail or what was

8    "interesting" about it. Ex. L Rider Dep. 70:10-72:6, 73:7-74:1, 78:9-80:3. And he can't

9    recall whether he ever suggested or recommended to Chief Smith or others that Sgt. Wender

10   should be terminated. *Id.* at 80:11-81:2.

11       H.    Cmdr. Rider's Actions Against Sgt. Wender Are Unique

12       Over the course of his career, Cmdr. Rider has been involved with at least ten internal

13   (administrative) investigations but only three other criminal investigations against fellow law

14   enforcement officers. Among those, Cmdr. Rider's actions toward Sgt. Wender stand out

15   with respect to political content, investigative steps taken, and the substance of the allegations.

16       None of Cmdr. Rider's other reports or disciplinary memos includes any reference to

17   anyone's political views or free speech activities. Ex. Y. None of the reports or memos

18   suggest that particular actions or inactions were motivated by an officer's personal or political

19   views. Ex. Y *see also* Ex. L Rider Dep. 90:13-129:3. And none of them shows that

20   Cmdr. Rider took any investigative steps to try to determine whether an officer's personal or

21   political views motivated their actions or inactions. Ex. Y

22       Cmdr. Rider also treated more serious allegations of criminal violations by others who

23   were not critical of the drug policy less seriously than he did the allegation involving

24   Sgt. Wender. In at least one instance, Cmdr. Rider imposed administrative discipline on a

25   Police Sergeant when he easily could have initiated a criminal investigation. Ex. Z. That

26   situation involved unwanted physical touching and assault and sustained findings:

27

MACDONALD HOAGUE & BAYLESS
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

[text redacted]

Ex. Z (LYNN 854). Despite the reported criminal nature of these allegations and a sustained finding that the conduct had occurred, Cmdr. Rider did not conduct or recommend a criminal investigation. *Id.* Instead, he handled it as a civil matter and dealt with it in-house. The Sergeant received a written reprimand for a violation of a general "Standard of Conduct." *Id.* During his deposition, Cmdr. Rider characterized the Sergeant's conduct as simply "horsing around." Ex. L Rider Dep. 101:21-105:7. [text redacted]

[text redacted] Had Cmdr. Rider researched and applied the criminal statutes, as he did with Sgt. Wender, he would have found a criminal violation:

**RCW 9A.36.041  Assault in the Fourth Degree**
(1) A person is guilty of assault in the fourth degree if, under circumstances not amounting to assault in the first, second, or third degree, or custodial assault, he or she assaults another.
(2) Assault in the fourth degree is a gross misdemeanor.

**RCW 9A.36.080 Malicious Harassment**
(1) A person is guilty of malicious harassment if he or she maliciously and intentionally commits one of the following acts because of his or her perception of the victim's race, color, religion, ancestry, national origin, **gender,** sexual orientation, or mental, physical, or sensory handicap:

   (a) **Causes physical injury to the victim** or another person;

* * *
(7) Malicious harassment is a class C felony.

In addition, despite the apparent gender-driven nature of the conduct, Cmdr Rider did no internet searches to find out if the Sergeant held gender-biased.

The contrast between these situations is striking. One reasonable inference to be drawn is that the reason Cmdr. Rider launched a criminal investigation into Sgt. Wender's conduct,

PLAINTIFF'S RESPONSE TO DEFENDANT CITY OF
LYNNWOOD AND STEVE RIDER'S MOTION FOR SUMMARY
JUDGMENT - 13

No. CV07-0197Z
8761.01/sc220901.v2

MACDONALD HOAGUE & BAYLESS
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

1   but conducted a mere internal investigation resulting in a "written reprimand" regarding the

2   conduct of the other police sergeant, is his actions toward Sgt. Wender were driven by First

3   Amendment animus.

II.    ARGUMENT

A.    First Amendment Retaliation[8]

6   Cmdr. Rider makes no attempt to set forth the elements of a First Amendment

7   retaliation claim, show as a matter of law which element is missing or argues that no issue of

8   material fact exists for resolution by the jury.  As such, he has not shifted the burden in the

9   first instance to Plaintiff to show issues of material fact. *Adickes v. S. H. Kress & Co.*, 398

10  U.S. 144, 159-160 (1970) (noting that the moving party has the burden "to show initially the

11  absence of a genuine issue concerning any material fact.")  Summary judgment should be

12  denied on this basis alone.

13  Plaintiff has substantial evidence to support all of his *prima facie* case.  "[A]ny person

14  or persons who, under color of law, deprives another of any rights, privileges, or immunities

15  secured by the Constitution or laws of the United States shall be liable to the injured party."

16  Ninth Cir. Jury Instr. 9.1; 42 U.S.C. § 1983.  Sgt. Wender will need to show at trial: (1) that he

17  engaged in speech or other specified conduct protected under the First Amendment; (2) that

18  Cmdr. Rider took action against him; and (3) that Sgt. Wender's protected speech or activities, or

19  the chilling of his speech or activities, was a substantial or motivating factor for Defendant

20  Rider's action.  Ninth Cir. Jury Instr. 9.10.  Cmdr. Rider violated the First Amendment if his

21  "actions would have chilled or silenced 'a person of ordinary firmness from future First

22  Amendment activities.'"  *See White v. Lee*, 227 F.3d 1214, 1241 (9th Cir. 2000) (quoting

23

24  [8] Defendant Rider misinterprets Plaintiff's reference in Paragraph 4.1 of the complaint to the
    Fourteenth Amendment to allege a violation of the Due Process Clause. *See Corrected* Mot. for
    Sum. Jud., Dkt. No. 90 at 12.  Defendant Rider's initial understanding of the reference to the

25  Fourteenth Amendment was a claim under the Equal Protection Clause. *See* Dkt. No. 84 at 12,
    14.  Paragraph 4.1 makes neither a "Due Process" claim nor an "Equal Protection" claim.  The

26  reference to the Fourteenth Amendment is simply pleading the applicability of the First
    Amendment to state and local government actors through the doctrine of incorporation. *See,*

27  *e.g., New York Times Co. v. Sullivan*, 376 U.S. 254, 277 (1964).

PLAINTIFF'S RESPONSE TO DEFENDANT CITY OF
LYNNWOOD AND STEVE RIDER'S MOTION FOR SUMMARY
JUDGMENT - 14

No. CV07-0197Z
8761.01/622090l.V2

*Mendocino Env'l Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999)). Plaintiff need not show that his own speech was chilled or suppressed. *White*, 227 F.3d at 1241.

    1.    <u>Section 1983 Provides Liability For All Damages Proximately Caused By Retaliation in Violation of the First Amendment</u>

Cmdr. Rider argues, without citation to any legal authority, that because he was not Sgt. Wender's employer, he cannot be held liable for First Amendment retaliation and the foreseeable--indeed intended--damages flowing from those acts. This is simply wrong.

"Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right,' and the law is settled that as a general matter, the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (quoting and citing *Crawford-El v. Brotton*, 523 U.S. 574, 588 n.10, 592 (1998)). It is clearly established that "[i]nformal measures, such as 'the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation,' can violate the First Amendment also." *White*, 227 F.3d at 1228 (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963)). The government may not punish a person on the basis of his constitutionally protected speech. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

Core political speech is afforded the highest degree of protection under the First Amendment, reflecting our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Indeed, the Supreme Court has made clear that "advocacy of a politically controversial viewpoint [ ] is the essence of First Amendment expression." *McIntyre v. Ohio Elections Com'n*, 514 U.S. 334, 347 (1995).

While it is certainly true that a public employee has a First Amendment right to speak on matters of public concern, *see, e.g., Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274 283-84 (1977), it does not follow that an employment relationship is required to hold a government actor liable for his own retaliatory acts that damage another's employment

PLAINTIFF'S RESPONSE TO DEFENDANT CITY OF
LYNNWOOD AND STEVE RIDER'S MOTION FOR SUMMARY
JUDGMENT - 15

No. CV07-0197Z
8761.0Fbe220901v2

MACDONALD HOAGUE & BAYLESS
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

1  relationship, or the damages flowing from those acts.  Cf. Def's Mot. Sum. Jud. at 12.

2  Indeed, the Ninth Circuit has explained the "nature of liability" under § 1983 as a matter of

3  causation, not legal relationship:

> [P]ersonal participation is not the only predicate for section 1983 liability.
> Anyone who 'causes' any citizen to be subjected to a constitutional deprivation
> is also liable. . . . [the] requisite causal connection can be established not only
> by some kind of direct personal participation in the deprivation, but also by
> setting in motion a series of acts by others which the actor knows or reasonably
> should know would cause others to inflict the constitutional injury.

*Gilbrook v. City of Westminster*, 177 F.3d 839, 854 (9th Cir. 1999) (quoting *Johnson v. Duffy*,

588 F.2d 740, 743-44 (9th Cir.1978)).

As with any § 1983 claim, there must be a causal nexus between the defendant's

retaliatory action and the plaintiff's injury.  *See* Ninth Cir. Model Jury Instr. 9.8.  "The

touchstone of proximate cause in a § 1983 action is foreseeability."  *Phillips v. Hust*, 477 F.3d

1070, 1077 (9th Cir. 2007).  Although he does not articulate it, the essence of Defendant

Rider's first argument is that Mountlake Terrace's termination of Sgt. Wender was an

"intervening cause" of damages to Sgt. Wender, cutting off the causal connection between

Defendant Rider's recommendation for "criminal or administrative" investigations and the

damage to Sgt. Wender's career.  The law is otherwise.  Traditional tort law defines

"intervening" causes that break the chain of proximate causation in § 1983 actions.  *Van Ort v.*

*Estate of Stanewich*,  92 F.3d 831, 837 (9th Cir. 1996) (citing *Prosser and Keeton on Torts* §

44, at 312 (5th ed.1984)).  "An unforeseen and abnormal intervention . . . breaks the chain of

causality, thus shielding the defendant from [section 1983] liability."  *Van Ort*, 92 F.3d at 837

(quoting *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 561 (1st Cir.1989) (original

quotations omitted)).  "Questions of proximate causation are issues of fact which are properly

left to the jury if reasonable persons could reach different conclusions."  *George v. City of*

*Long Beach*, 973 F.2d 706, 709 (9th Cir. 1992).

Here, not only were negative employment ramifications a *foreseeable* consequence of

Defendant Rider's recommendation of "criminal or administrative" investigations and

MACDONALD HOAGUE & BAYLESS
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

1  proceedings, those ramifications were the *intended* consequence.  Cmdr. Rider intentionally

2  set in motion a series of events designed *at least* to lead to discipline by Mountlake Terrace, as

3  well as to result in charging, prosecution, and conviction.  Indeed, Cmdr. Rider knew *and*

4  *intended* that Sgt. Wender would be subjected to discipline up to or including termination.

5  Ex. L Rider Dep. 79:15-80:1.  And because these actions were motivated by Cmdr. Rider's

6  prejudicial views on Sgt. Wender's "outspoken" activities on drug policy, as set forth above,

7  they violate the First Amendment.

8          Defendant Rider's claim that he shouldn't be held liable for the ultimate consequences

9  of his actions--adverse employment up to and including termination--because he could not

10  foresee them, has no merit.  He is liable for those, as well as the other, harm caused by

11  initiating the criminal investigation.

12          2.      Cmdr. Rider Retaliated Against Sgt. Wender For His Views On Drug Policy

13          Under the argument heading "No Violation Of Due Process," Cmdr. Rider essentially

14  argues that he cannot be held liable for his retaliatory acts against Sgt. Wender's First

15  Amendment-protected speech, views and activities.  The basis for Defendant Rider's motion

16  on this claim is unclear.  As noted above, *supra* at n. 4, Defendant's failure to set forth the

17  applicable legal standards and make a showing why he is entitled to judgment as a matter of

18  law does not shift the burden to Plaintiff in the first instance.  *Adickes*, 398 U.S. at 161

19  (stating that "if he does not discharge that burden then he is not entitled to judgment. No

20  defense to an insufficient showing is required." (citation omitted)).

21          Out of an abundance of caution, however, Plaintiff sets forth the appropriate standards

22  under the First Amendment, relevant evidence, and the issues of material fact.  Sgt. Wender

23  must show (1) that he participated in protected speech or activities; (2) that Defendant Rider

24  took an action against him; (3) that the protected speech or activities (or the chilling thereof)

25  were a substantial or motivating factor for Defendant Rider's action.

26

27

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

a.    Protected Speech or Activity

Defendant Rider does not contend that Plaintiff's "outspoken" comments and activities on drug policy were not protected speech. The fact that Sgt. Wender was engaged in core political speech with a "politically controversial viewpoint" subjects Cmdr. Rider's actions to the highest scrutiny under the First Amendment.

b.    Action Against Sgt. Wender

Defendant Rider does not contend that he did not take any action against Sgt. Wender, or that his action would not have "chilled or silenced a person of ordinary firmness from future First Amendment activities." *See White v. Lee*, 227 F.3d 1214, 1241 (9th Cir. 2000) (quotations and citations omitted). "Informal measures" like Defendant Rider's memo invoking legal sanctions against Sgt. Wender by recommending and initiating criminal and administrative proceedings can certainly have the required "chill" that violates the First Amendment. *See White*, 227 F.3d at 1228 (holding that protracted investigation by HUD would "chill" First Amendment activities even though no criminal or civil charges were brought); *see also Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963) (holding that "threats to institute criminal proceedings" can chill free speech activities). This is especially true when the free-speech activity—being "outspoken" on a controversial and important matter of public concern—is directly linked to the call for adverse action, as it is here.

c.    Substantial or Motivating Factor

Defendant Rider's only argument, it appears, is that Plaintiff does not have sufficient evidence of Defendant Rider's retaliatory motive. He does.

(1)    The Memo

Cmdr. Rider explicitly included commentary on Sgt. Wender's First Amendment-protected viewpoint and activities in recommending a criminal investigation for which motive is not an element. This is direct evidence of political viewpoint discrimination, and is in and of itself sufficient to support an inference of improper motive in initiating criminal and administrative disciplinary proceedings against Sgt. Wender, precluding summary judgment.

PLAINTIFF'S RESPONSE TO DEFENDANT CITY OF
LYNNWOOD AND STEVE RIDER'S MOTION FOR SUMMARY
JUDGMENT - 18

No. CV07-0197Z
8701.01 bc220901.v2

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

In admonishing Sgt. Wender that "manufacturing marijuana is a class C felony whether one agrees with the law or not," Cmdr. Rider imputed criminal motive to Sgt. Wender's actions in handling the June call, asserting that Sgt. Wender had behaved inappropriately--in Cmdr. Rider's mind, criminally--in accordance with his political views.[9]

Other than First Amendment political prejudice, there is no basis for this leap of logic. There might be a connection if Sgt. Wender had a practice of "blowing off" drug calls. But other than the alleged mishandling of the June 9, 2005 call, there is *no evidence* that Sgt. Wender has *ever* failed to appropriately enforce the drug laws or been criticized for doing so, including the people who knew him the best. Assistant Chief Caw testified that Sgt. Wender "did his job" in enforcing drug laws, and knew of no other situation in which Sgt. Wender had not done so. Ex. Q Caw Dep. 147:18-148:17. Assistant Chief Mitchell likewise could not identify any instances in which Sgt. Wender had failed to enforce the drug laws. Ex. O Mitchell Dep. 88:22-91:10.[10] Cmdr. Rider knows of no other instance in which he disagreed with the way Sgt. Wender handled a call. Ex. L (Rider Dep. 32:11-14).

No one in any part of any investigation, including Cmdr. Rider, ever asked Sgt. Wender whether or not he thought that his personal views had clouded his judgment. Yet starting with Cmdr. Rider, through the remainder of the events that led to Sgt. Wender's termination, everyone merely *assumed* that this was the case. This is pure prejudice. Rather than conclude that Sgt. Wender merely handled the call improperly or differently from what

---

[9] Defendant Rider makes much ado over Sgt. Wender's interpretation of this statement—that Defendant Rider was "clearly inferring here that my political beliefs led me to do something that he thinks was not upholding the law." Mot. at 14. Defendant's argument ignores pages of testimony in which Plaintiff explained how this inference was logically unsound, how he has never in fifteen years seen criminal allegations leveled against an officer for exercising discretion, and how the inclusion of commentary on his political views showed the retaliatory animus that drove the substance and severity of Defendant Rider's actions. Ex. P Wender Dep. pp.454-457, 464-468.

[10] Indeed, the opposite is true. Det. Corey Williams of the Task Force testified that Sgt. Wender passed along intelligence information regarding drug-related activities, that he was very "proactive" about drug enforcement, and that he helped Det. Williams recruit confidential informants. Ex. M Williams Dep. 66:18-69:7.

PLAINTIFF'S RESPONSE TO DEFENDANT CITY OF
LYNNWOOD AND STEVE RIDER'S MOTION FOR SUMMARY
JUDGMENT - 19

No. CV07-0197Z

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

1  Cmdr. Rider might have done in similar circumstances, Cmdr. Rider jumped to the conclusion

2  that Sgt. Wender *committed a crime*, motivated by his personal political views on drug policy.

3  This isn't careful policing.  It is political bias resulting in hyper-scrutiny.

4      If Cmdr. Rider had made the same assumptions along racial lines, there would be no

5  question that his inclusion of such a comment would be improper, and would support an

6  inference of racial bias.  For example, if the memo had been about the conduct of an African

7  American police officer, such a bias as would be obvious:

> Officer Doe is African-American.  The released suspect in this case was black.
> But whether or not someone is black or white, one has a duty to enforce the
> laws and arrest the suspect.

10  If the conduct had been about a female police officer, the prejudice would be clear as well:

> Officer Doe is female and is an outspoken feminist.  So is the suspect in this
> case.  But whether or not on is a feminist, the law must be enforced.

The prejudice that led to Cmdr. Rider to conclude that Sgt. Wender's handling of the call was

driven by his political views is no less pernicious, and his actions on the basis of that prejudice

constitutes retaliation.

      Defendant Rider's inability in his deposition to justify inclusion of this statement

underscores the importance of the jury's assessment of his credibility in determining his

motives.  The fact that a statement is "true" does not justify its inclusion in a government

memorandum recommending criminal sanctions.  Many things are "true" that Defendant Rider

failed to include in his memo, despite their relevance to his analysis.  Defendant Rider didn't

mention that Sgt. Wender had never failed to enforce the drug laws.  He didn't mention that he

is a 15 year veteran law enforcement officer with a near-spotless record.  He didn't even

mention that Sgt. Wender had run a search on the ex-husband on police databases, or that

there was no ongoing investigation into the ex-husband's conduct prior to Sgt. Wender's

handling of the June 9, 2005 call.  One reasonable inference that can be drawn from Defendant

Rider's inclusion of Sgt. Wender's "outspoken" drug policy views and his failure to include

PLAINTIFF'S RESPONSE TO DEFENDANT CITY OF
LYNNWOOD AND STEVE RIDER'S MOTION FOR SUMMARY
JUDGMENT - 20

No. CV07-0197Z
8761.01 be22b901v2

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

1    these other facts is that he was spinning the facts to put Sgt. Wender in the worst light

2    possible, and to imply that Sgt. Wender had criminal intent, when none in fact existed.

3    (2)    Mocking Sgt. Wender's Views on Criminal Justice

4    More direct evidence of Defendant Rider's retaliatory motive is his contemporaneous

5    mocking of Sgt. Wender's political views on criminal justice expressed in an internet article

6    regarding Sgt. Wender's doctoral thesis.  Ex. 80 LYNN 522 and Ex. 35 Reader's Digest

7    article.  Not only was Defendant Rider's internet research against Sgt. Wender an anomaly in

8    Defendant Rider's history of investigating officers, his comments regarding Sgt. Wender's

9    political viewpoints are nothing short of vindictive and prejudicial, especially given that he was

10   criminally investigating him at the same time.

11   Defendant Rider tried to explain in his deposition that the only reason that he looked up

12   Sgt. Wender on the internet and sarcastically commented on a quotation from Sgt. Wender was

13   because he had heard that Sgt. Wender was a professor, thought his comments were "funny,"

14   and that the views expressed were different from his own.  Ex. L Rider Dep. 53:4-55:14.  He

15   also tried to state that his internet research and sarcastic remarks were completely disconnected

16   from his allegations of criminal conduct.  Ex. L Rider Dep. 51:3-52:3.  But the timing of his

17   mockery belies that explanation, and is circumstantial evidence of motive:

18
     | | |
     |---|---|
     | Thursday, June 9, 2005 | Call regarding single marijuana plant handled by Sgt. Wender. |
19
20   | Friday, June 10, 2005 | Complainant unlawfully enters ex-husband's house, discovers additional plants, photographs plants, Task Force executes search warrant.  Defendant Rider hears of the situation. |
21
22   | Monday, June 13, 2005 | Defendant Rider mocks Plaintiff's views on criminal justice, saying "Nice, huh?" |
23
24   | Tuesday, June 14, 2005 | Defendant Rider finalizes memorandum including criminal allegations against Sgt. Wender. |

25   A jury will have to decide whether they believe Defendant Rider's claim that these events had

26   "nothing to do with" one another.

27

MACDONALD HOAGUE & BAYLESS
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

(3)    <u>Retalitory Retribution Following Exercise of Discretion</u>

Central to this case is Defendants' contention that Sgt. Wender did not have discretion to handle the call as he did. As set forth above, many, many officers, along with police practices expert Ret. Chief of Police Don Van Blaricom state that this was well within his discretion. Defendants disagree. But on summary judgment, the Court must accept Plaintiff's factual contentions as true and draw all reasonable inferences in his favor. Together with the direct evidence of his motive included in his action memo, the inference is reasonable that Defendant Rider subjected Sgt. Wender to heightened scrutiny and unwarrantedly serious retribution because of his political beliefs. This is also shown by his decision <u>not</u> to pursue a criminal investigation in a situation in which another sergeant (who is not outspoken on drug policy) harassed and assaulted a woman. *See supra* at 13-14.

(4)    <u>Other Causes</u>

Defendant Rider's repeated reference to the fact that he took the actions set forth herein because he had a duty under Lynnwood policy to do so, Motion at 5, 20, 21, also is not dispositive. The issue is whether an unlawful motive was "a substantial or motivating factor" for his actions, not whether it was the *only* motivation. *See, e.g.,* Ninth Cir. Jury Inst. 9.10. As in any proximate cause analysis, there can be multiple causes of injury. Further, the Lynnwood policy says nothing requiring a Lynnwood officer to report allegations against an officer from *another agency*; the policy focuses on *departmental* personnel: "employees who know of or observe a violation of laws, ordinances, rules of conduct, official orders, or demonstrated incompetency *on the part of other departmental personnel* shall report such instances at once to their immediate supervisor." Rider Decl., Ex. 2, § 7.03.03 (emphasis added).

B.    <u>Defendant Rider is Not Entitled to Qualified Immunity on Plaintiff's First Amendment Claim</u>

Defendant Rider cannot claim the benefits of qualified immunity on Plaintiff's First Amendment claim. The law on First Amendment retaliation has long been clearly established at the Ninth Circuit and Supreme Court levels. On summary judgment, where all Plaintiff's facts

MACDONALD HOAGUE & BAYLESS
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

1    must be accepted as true and all reasonable inferences must be drawn in his favor, the Court must

2    conclude that Cmdr. Rider violated Sgt. Wender's First Amendment rights.

3        1.    Defendant Rider's Conduct Violated the First Amendment

4        In the first step of qualified immunity analysis, the Court must determine whether,

5    "[b]ased up on the facts taken in the light most favorable to the party asserting the injury, did the

6    officer's conduct violate a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  As

7    set forth above, Cmdr. Rider's acts violated Sgt. Wender's right to be free from retaliation for

8    political viewpoint, guaranteed by the First Amendment to the U. S. Constitution.

9        2.    The Law Was Clearly Established

10       Defendant Rider attempts to define the alleged constitutional violation extraordinarily

11   narrowly in order to conclude that the law has not been clearly established.  Specifically,

12   Defendant argues that it was not clear that "Cmdr. Rider's one sentence discussion to his

13   superior officers of plaintiff's view on drug laws" would violate Sgt. Wender's First Amendment

14   rights.  Of course, there is no threshold number of sentences before an act can be retaliatory,

15   Plaintiff's evidence of First Amendment retaliation is not limited to that single sentence, and

16   Cmdr. Rider's unlawful conduct was to initiate a criminal investigation of Sgt. Wender because

17   of his viewpoint.

18       The doctrine of qualified immunity does not require that the exact facts alleged have been

19   previously declared to be unconstitutional.  A law can be violated "notwithstanding the absence

20   of direct precedent ... [o]therwise, officers would escape responsibility for the most egregious

21   forms of conduct simply because there was no case on all fours prohibiting that particular

22   manifestation of unconstitutional conduct." *Headwaters Forest Defense v. County of Humboldt*,

23   276 F.3d 1125, 1131 (C.A.9,2002) (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1274-75 (9th

24   Cir.2001) (citation omitted)).  *See also Anderson v. Creighton*, 483 U.S. 635, 640 (1987)

25   (rejecting argument that an officer may not be held liable "unless the very action in question has

26   previously been held unlawful").  Rather, the law must be sufficiently well-established to put a

27

1    reasonably prudent officer on notice that his actions would violate the law.  *Saucier v. Katz*, 533

2    U.S. 194, 201-203 (2001)

3          Here, the law was clear, at least since 2000, that retaliation by a government actor

4    initiating and conducting in an investigation against a citizen for their political viewpoint or free

5    speech activities was against the law.

6          The investigation by the HUD officials unquestionably chilled the plaintiffs'
          exercise of their First Amendment rights. It is true that the agency did not ban or
7          seize the plaintiffs' materials, and officials in Washington ultimately decided not
          to pursue either criminal or civil sanctions against them. But in the First
8          Amendment context, courts must "look through forms to the substance" of
          government conduct. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67, 83 S.Ct.
9          631, 9 L.Ed.2d 584 (1963). Informal measures, such as "the threat of invoking
          legal sanctions and other means of coercion, persuasion, and intimidation," can
10         violate the First Amendment also. *Id*. This court has held that government
          officials violate this provision when their acts "would chill or silence a person of
11         ordinary firmness from future First Amendment activities." *Mendocino
          Environmental Ctr. v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir.1999)
12         (citation omitted).

13   *White v. Lee*, 227 F.3d 1214, 1228 (9th Cir. 2000).

14         Defendant Rider's reliance on RCW 4.24.510 is also misplaced.  This Court has already

15   held that this statute can not stand as a bar to liability for federal constitutional violations and

16   damages pursuant to 42 U.S.C. § 1988.  Dkt. No. 50.  By this same logic, the statute may not

17   provide a justification for Cmdr. Rider's retaliatory act or qualified immunity for it.

18         C.    <u>Due Process Claims</u>

19         Pursuant to Fed. R. Civ. Pro. 41(a)(2), Plaintiff moves the Court to voluntarily dismiss

20   his procedural due process claims against the City of Lynnwood and Cmdr. Rider brought under

21   the Due Process Clause of the Fourteenth Amendment and 42 U.S.C. § 1983.

22                     III.    CONCLUSION

23         Plaintiff respectfully requests that Defendant Rider's Motion for Summary Judgment

24   regarding First Amendment retaliation be denied.

25

26

27

1    DATED this 30th of June, 2008.

2                                    MacDONALD HOAGUE & BAYLESS

3
                                     By: /s/Andrea Brenneke
4                                         Andrea Brenneke, WSBA #22027
                                          Joseph R. Shaeffer, WSBA #33273
5                                         Attorneys for Plaintiff

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

PLAINTIFF'S RESPONSE TO DEFENDANT CITY OF
LYNNWOOD AND STEVE RIDER'S MOTION FOR SUMMARY
JUDGMENT - 25
No. CV07-0197Z
8761.01 be220901.v2

MacDONALD HOAGUE & BAYLESS
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

1

<u>CERTIFICATE OF SERVICE</u>

2

I certify that on the date noted below I electronically filed this document entitled

3

**PLAINTIFF'S RESPONSE TO DEFENDANT CITY OF LYNNWOOD AND STEVE**

4

**RIDER'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the

5

CM/ECF system which will send notification of such filing to the following persons:

6

<u>Counsel for MLT, MLT PD, Smith, and Caw</u>
Michael C. Bolasina

7

Stafford Frey Cooper
601 Union Street, Suite 3100

8

Seattle, WA 98101-1374
Phone:  (206) 623-9900

9

Fax:  (206) 748-9025
Email:  mbolasina@staffordfrey.com;

10

nskretta@staffordfrey.com

11

12

<u>Counsel for Lynnwood & Rider</u>
Robert L. Christie
Christie Law Group, PLLC
2100 Westlake Ave., N., Suite 206
Seattle, WA 98109
Phone:  (206) 957-9669
Fax:  (206) 352-7875
Email:  bob@christielawgroup.com;
jason@christielawgroup.com;
tom@christielawgroup.com;
robertchristie@mac.com;
maureen@christielawgroup.com

13

<u>Counsel for Lynnwood & Rider</u>
Thomas Miller

14

Christie Law Group, PLLC
2100 Westlake Ave. N., Suite 206

15

Seattle, WA 98109
Phone:  (206) 957-9669

16

Fax:  (206) 352-7875
Email:  tom@christielawgroup.com;

17

tmiller@ihmail.com

18

19

<u>Counsel for Snohomish Co, Ellis, Roe & Does</u>
Michael Held
Charlotte F. Comer
Snohomish County Prosecuting Attorney –
Civil Division
Admin East 7th Floor, M/S 504
3000 Rockefeller Avenue
Everett, WA  98201-4060
Phone:  (425) 388-6330
Fax:  (425) 388-6333
Email:  mheld@co.snohomish.wa.us;
pfowler@co.snohomish.wa.us;
Lisa.Lindquist@co.snohomish.wa.us;
ccomer@co.snohomish.wa.us;
gbennett@co.snohomish.wa.us

20

21

<u>Assoc. Counsel for MLT & MLT PD</u>
Gregory G. Schrag

22

Gregory G. Schrag, LLC
21907 – 64th Ave. W., Suite 370

23

Mountlake Terrace, WA 98043
Phone:  (425) 776-7386

24

Fax:  (425) 672-4219
Email:  schragaty@aol.com

25

<u>Counsel for Mitchell</u>
John T. Kugler
Burgess Fitzer, P.S.
1145 Broadway, Suite 400
Tacoma, WA 98402
Phone:  (253) 572-5324
Fax:  (253) 627-8928
Email:  johnk@burgessfitzer.com;
dianam@burgessfitzer.com

26

27

PLAINTIFF'S RESPONSE TO DEFENDANT CITY OF
LYNNWOOD AND STEVE RIDER'S MOTION FOR SUMMARY
JUDGMENT - 26

No. CV07-0197Z

8761.b1ce22o901.v2

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

1    DATED this 30th day of June, 2008, at Seattle, Washington.

2

3                                    /s/Andrea Brenneke
4                                    Andrea Brenneke

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

PLAINTIFF'S RESPONSE TO DEFENDANT CITY OF
LYNNWOOD AND STEVE RIDER'S MOTION FOR SUMMARY
JUDGMENT - 27

No. CV07-0197Z
8761.01  ee220901.v2

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961